# IN THEUNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSHUA VASQUEZ and | ) | |
| MIGUEL CARDONA, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 16-cv-8854 |
| | ) | |
| v. | ) | Hon. Amy J. St. Eve |
| | ) | |
| KIMBERLY M. FOXX, in her official | ) | |
| capacity as the State's Attorney of | ) | |
| Cook County, and the CITY OF | ) | |
| CHICAGO, a municipal corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Defendants Kimberly M. Foxx,[1] in her official capacity as the State's Attorney of Cook

County (the "State's Attorney"), and the City of Chicago (the "City") have moved to dismiss

Plaintiffs Joshua Vasquez ("Vasquez") and Miguel Cardona's ("Cardona") complaint, (R. 23,

26), in which they allege violations of 42 U.S.C. § 1983, (R. 1). For the following reasons, the

Court grants Defendants' motions.

## BACKGROUND[2]

### I.      Facts

Plaintiffs challenge the constitutionality and enforcement procedures of 720 Ill. Comp.

---

[1] One of the original defendants in this case was Anita Alvarez. Kimberly Foxx replaced her as State's Attorney on December 1, 2016. (R. 41, State's Attorney Reply, at 1 n.1.) Under Federal Rule of Civil Procedure 25(d)(1), Kimberly Foxx has replaced Anita Alvarez as a defendant in this case.

[2] The facts presented in the Background are taken from the complaint and are presumed true for the purpose of resolving the pending motion to dismiss under Rule 12(b)(6). *See Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 823 (7th Cir. 2014); *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Stat. 5/11-9.3(b-10) ("the residency statute"), an Illinois law that generally prohibits "child sex offender[s]" from "knowingly resid[ing] within 500 feet of a playground, child care institution, day care center, part day child care facility, day care home, group day care home, or a facility providing programs or services exclusively directed toward persons under 18 years of age." (R. 1.). Both Plaintiffs are Chicago residents and are subject to the residency statute because Vasquez was convicted of one count of possession of child pornography in 2001 and Cardona was convicted of indecent solicitation of a child in 2004. (*Id.* at ¶¶ 7–8, 22, 35.) Certain exceptions to the residency statute exist, but they do not apply in this case.[3]

For the last three years, Vasquez has resided in an apartment with his wife and their nine-year-old daughter. (*Id.* at ¶ 24.) They rent the apartment and have a one-year lease that ends on August 19, 2017. (*Id.*) When Vasquez and his family decided to move there, the Chicago Police Department ("CPD") confirmed that it complied with the residency statute. (*Id.* at ¶ 26.) Although there has been a home day care 550 feet from Vasquez's residence since he and his family began living there, "no problems" have arisen. (*Id.* at ¶ 31.)

On August 25, 2016, Vasquez went to CPD headquarters to complete an annual sex offender registration requirement. (*Id.* at ¶ 27.) Upon completing his registration, a CPD officer gave him a notification form indicating that a home daycare had opened 480 feet from his residence and that if he failed to move by September 24, 2016, he could be arrested and prosecuted. (*Id.* at ¶ 28.) Providing this notification was consistent with the CPD's policy of "giv[ing] people classified as child sex offenders 30 days to move from their residence" when

---

[3] One such exception is that that "[n]othing . . . prohibits a child sex offender from residing within 500 feet of a day care home or group day care home if the property is owned by the child sex offender and was purchased before August 14, 2008." 720 Ill. Comp. Stat. 5/11-9.3(b-10). It does not apply to Plaintiffs because Vasquez rents his home and Cardona did not own his home until 2010. (R. 1 at ¶¶ 24, 38; R. 4, Pls.' Mot. Emergency Injunctive Relief, at 6.)

they are notified that they are out of compliance with the residency statute. (*Id.* at ¶ 2.) This was the second time in the past five years that Vasquez has received such a notification. (*Id.* at ¶ 32.) In 2013, Vasquez and his family moved because someone obtained a daycare license within 500 feet of his apartment. (*Id.*)

Vasquez alleges that he has searched for suitable, affordable housing that complies with Illinois law, but has been unsuccessful. (*Id.* at ¶ 29.) He says that if he is "forced to vacate his home by September 24, he will be homeless and will be separated from his wife and daughter." (*Id.*) Vasquez and his wife, in selecting their current apartment, took care to remain in the same neighborhood in which they had previously resided so their daughter would not have to change elementary schools. (*Id.* at ¶ 33.) "If Vasquez's family has to move from their home, his daughter's schooling will be disrupted if they cannot find a compliant address within the same school district." (*Id.* at ¶ 34.)

Cardona lives with his mother in a home in Chicago that he has owned since 2010 and lived in for about twenty-five years. (*Id.* at ¶ 38.) "Cardona is the full-time caretaker for his mother, who has lung cancer and is currently undergoing chemotherapy." (*Id.* at ¶ 37.) According to Cardona's complaint, if he is forced to move, "his mother will be left without [his] assistance," which she relies upon. (*Id.* at ¶ 43.)

Each year between 2006 and 2015 when Cardona completed his annual sex offender registration, the CPD has confirmed that his address complied with the residency statute. (*Id.* at ¶ 39.) When Cardona completed his registration in August 2016, however, the CPD provided him a notice that his address did not comply with the residency statute because of a home daycare 475 feet away from his home. (*Id.* at ¶ 41.) Cardona thus was given thirty days to vacate his home. (*Id.* at ¶ 76.) "According to the website for the Illinois Department of Children

and Family Services," there had been a group daycare home at the location referenced by the CPD since 2014.  (*Id.* at ¶ 45.)  It is unclear why the CPD did not inform Cardona that his residence did not comply with the residency statute until 2016.

## II.     Procedural History

Plaintiffs' complaint alleges four counts of violations of 42 U.S.C. § 1983.  First, Plaintiffs allege that "[t]he retroactive application of [the residency statute] violates the Ex Post Facto Clause of the U.S. Constitution, Art. I, § 10, cl. 1, because it makes more burdensome the punishment imposed for offenses committed prior to enactment of the law, and it applies retroactively," ("Count I").  (*Id.* at ¶ 81.)  Second, Plaintiffs allege that "[t]he application of [the residency statute] to Plaintiffs . . . without any notice, hearing and/or determination of whether the individual affected poses a threat to the community violates the [Fourteenth] Amendment guarantee of procedural due process," ("Count II").  (*Id.* at ¶ 83.)  Third, Plaintiffs allege that the residency statute deprives them of property without just compensation in violation of the Takings Clause of the Fifth Amendment ("Count III").  (*Id.* at ¶ 85.)  Fourth, Plaintiffs allege that the residency statute is unconstitutional under the Fourteenth Amendment's Due Process Clause because its "prohibitions . . . are not rationally related to a legitimate state interest and thus fail rational basis review," ("Count IV").  (*Id.* at ¶ 87.)  The Plaintiffs seek injunctive and declaratory relief, nominal and/or compensatory damages, and attorneys' fees and costs.  (*Id.* at ¶¶ 81, 83, 85, 87.)

On September 13, 2016, Plaintiffs filed a motion for Emergency Injunctive Relief. Ultimately, the Court granted a temporary restraining order without objection, "enjoining the Defendants from forcing Plaintiffs to vacate their home and/or arresting them for violation of [the residency statute]."  (R. 22.)

On September 29, 2016, Defendants filed the current motions to dismiss Plaintiffs' complaint, which the Court grants.  (R. 23, 26.)

## LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted."  *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014).  Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.*  Put differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  In determining the sufficiency of a complaint under the plausibility standard, courts must "accept all well-pleaded facts as true and draw reasonable inferences in [a plaintiff's] favor."  *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016).

## ANALYSIS

Defendants argue that Plaintiffs fail to state procedural due process, ex post facto, substantive due process claims, and Takings Clause claims.  The Court considers the viability of those claims in turn.  First, however, the Court evaluates the State's Attorney's argument that

consideration of the merits is unnecessary because the Court must abstain from hearing this case

based on the *Younger* abstention doctrine.[4]

## I.      *Younger* **Abstention**

The State's Attorney argues that the Court must abstain from asserting jurisdiction over

this case under the principles articulated in *Younger v. Harris*, 401 U.S. 37 (1971), and its

progeny.  (R. 26, State's Attorney Mot. Dismiss, at 5.).  "*Younger* holds that federal courts must

abstain from taking jurisdiction over federal constitutional claims that may interfere with

*ongoing* state proceedings."  *Gakuba v. O'Brien*, 711 F.3d 751, 753 (7th Cir. 2013) (emphasis

added); *see Younger*, 401 U.S. at 41 ("[W]e have concluded that the judgment of the District

Court, enjoining appellant Younger from prosecuting under these California statutes, must be

reversed as a violation of the national policy forbidding federal courts to stay or enjoin pending

state court proceedings except under special circumstances."); *Sykes v. Cook Cty. Court Prob.

Div.*, 837 F.3d 736, 740 (7th Cir. 2016).  "It is well established that *Younger*'s concepts . . . are

inapplicable 'when no state proceeding was pending . . . .'"  *Vill. of DePue v. Exxon Mobil

Corp.*, 537 F.3d 775, 783 (7th Cir. 2008); *see also Gakuba*, 711 F.3d at 753 (explaining that

*Younger* abstention applies where there is an ongoing state proceeding); *Kurtz Invs. Ltd. v. Vill.

of Hinsdale*, No. 15 C 1245, 2015 WL 4112879, at *2 (N.D. Ill. July 7, 2015) ("*Younger*

abstention applies only when there is an action pending in state court against the federal plaintiff

and the state is seeking to enforce the contested law in that proceeding."); *Bolton v. Bryant*, 71 F.

Supp. 3d 802, 813 (N.D. Ill. 2014).

---

[4] The City argues that Plaintiffs fail to state a claim in Counts I–III under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), because, according to the City, municipalities are not liable under § 1983 for "a policy of enforcing state law." (R. 24, City's Mem. Supp. Mot. Dismiss, at 4.)  Because the Court concludes that Plaintiffs' claims fail on the merits, it need not consider whether Plaintiffs fail to state a *Monell* claim against the City.

The State's Attorney argues that "[t]he Seventh Circuit has recognized that when a criminal prosecution is 'imminent, then a federal court might well abstain on comity grounds— for the prosecution would offer [the defendant] an opportunity to present its legal arguments, and states are entitled to insist that their criminal courts resolve the entire dispute." (R. 26 at 5 (alteration in original) (quoting *520 S. Mich. Ave. Assocs. Ltd. v. Devine*, 433 F.3d 961, 963 (7th Cir. 2006)).) This argument is unavailing. As discussed above, the Seventh Circuit has said that *Younger* applies when there is an ongoing state proceeding, which there is not in the current case. *See also Sykes*, 837 F.3d at 740–41; *Pindak v. Dart*, No. 10 C 6237, 2011 WL 4337017, at *5 (N.D. Ill. Sept. 14, 2011) ("Because there is no ongoing state proceeding involving Plaintiff, *Younger* abstention is inapplicable here."). Moreover, the Seventh Circuit has explained that the language the State's Attorney cites from *Devine* is "dicta." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 594 (7th Cir. 2012). In *ACLU of Illinois*, the State's Attorney made an argument similar to one she makes here. *Id.* The Seventh Circuit rejected that argument, explaining that by the State's Attorney's logic, "*Younger* precludes all federal preenforcement challenges to state laws," which was "obviously not right." *Id.*[5]

Plaintiffs also have standing to bring a preenforcement challenge. "It is well established that 'preenforcement challenges . . . are within Article III." *Id.* at 590 (alteration in original) (quoting *Brandt v. Vill. of Winnetka*, 612 F.3d 647, 649 (7th Cir. 2010))). "To satisfy the injury-in-fact requirement in a preenforcement action, the plaintiff must show 'an intention to engage in

---

[5] The State's Attorney also argues that the Court should abstain because the Supreme Court "has long disfavored the concept of enjoining future State court criminal prosecutions." (R. 26 at 6.) The State's Attorney points to, among other cases, *Wooley v. Maynard*, 430 U.S. 705, 711–12 (1977), where the Supreme Court considered whether enjoining the enforcement of a state statute was appropriate or whether the district court was limited to granting declaratory relief. (*Id.* at 6–7.) Here, Plaintiffs seek declaratory as well as injunctive relief. Thus, even if the State's Attorney were correct that injunctive relief were not appropriate, abstaining at this stage of the litigation is not required. Indeed, in a case in which the ACLU brought a preenforcement challenge to an Illinois criminal law seeking injunctive and declaratory relief, the Seventh Circuit held that *Younger* did not apply and that the ACLU had standing. *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 586, 590–94 (7th Cir. 2012).

a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder.'" *Id.* at 590–91 (alteration in original) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *see also Second Amendment Arms v. City of Chicago*, 135 F. Supp. 3d 743, 750 (N.D. Ill. 2015). Here, the CPD threatened enforcement against the Plaintiffs if they did not vacate their homes within a given time period. Plaintiffs seek to determine whether the state law requiring them to vacate their homes is constitutional before they either abandon their homes or risk serious criminal penalties. Plaintiffs therefore have standing to bring this preenforcement action.

Because Plaintiffs have standing to bring this preenforcement action and *Younger* abstention is not appropriate, the Court proceeds to the merits of Plaintiffs' claims.

## II.     Procedural Due Process

Plaintiffs allege that the residency statute violates their rights to procedural due process because "[p]rior to applying the residency restrictions . . . or forcing an individual to move from his home, neither the City nor the state provides any hearing or other procedure to determine whether the individual affected poses a threat to the community." (R. 1 at ¶ 50.) By failing to provide such a hearing, Plaintiffs contend, "the Defendants arbitrarily restrict Plaintiffs' and others' fundamental right to familial consortium and their right to choose where and with whom they reside." (*Id.*) Plaintiffs' claim does not succeed.

"[D]ue process does not entitle [an individual] to a hearing to establish a fact that is not material under the [relevant] statute." *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7 (2003); *see also, e.g.*, *Universal City Studios LLLP v. Peters*, 402 F.3d 1238, 1244 (D.C. Cir. 2005) (Roberts, J.); *People v. Leroy*, 828 N.E.2d 769, 778 (Ill. App. Ct. 2005) (considering a previous version of the residency statute). In *Connecticut Department of Public Safety v. Doe*, a convicted

sex offender challenged a law requiring a state agency to publicly disclose on the Internet a sex

offender registry. 538 U.S. at 4–6. The Supreme Court rejected the offender's procedural due

process argument that he was entitled to a hearing to determine if he was likely to be currently

dangerous because a finding related to current dangerousness was not a relevant consideration

under the relevant statute. *Id.* at 4, 7. In short, the Supreme Court explained, it would not matter

"if [he] could prove that he is not likely to be currently dangerous" because "Connecticut has

decided that the registry information of *all* sex offenders—currently dangerous or not—must be

publicly disclosed." *Id.* (emphasis in original).

In the current case, the question of whether a person currently "poses a threat to the

community" is irrelevant to the residency statute's applicability. Thus, Plaintiffs' procedural due

process claim fails. The question remains, however, whether Plaintiffs have a viable substantive

due process claim—an issue that the Court considers later. *See id.* at 8.

## III.    Ex Post Facto

Plaintiffs argue that the residency statute violates the Ex Post Facto Clause of the

Constitution because it applies to them retroactively and "cross[es] the line from a regulatory

scheme into the realm of punishment." (R. 32, Pls.' Response to State's Attorney Mot., at 8; R.

1 at ¶ 17). The Court rejects this argument.

The Ex Post Facto Clause "prohibits 'the imposition of punishment more severe than the

punishment assigned by law when the act to be punished occurred.'" *United States v. Diggs*, 768

F.3d 643, 645 (7th Cir. 2014) (quoting *Weaver v. Graham*, 450 U.S. 24, 30 (1981)); *see* U.S.

Const. art. I, § 9, cl. 3; *Peugh v. United States*, 133 S. Ct. 2072, 2081 (2013). "To violate the Ex

Post Facto Clause, . . . a law must be both retrospective *and* penal." *United States v. Leach*, 639

F.3d 769, 773 (7th Cir. 2011). Here, Plaintiffs were convicted of their crimes before the Illinois

legislature amended the residency statute to include a prohibition on living 500 feet from a "day care home" or "group day care home." *See* Ill. Pub. Act 95-821, § 5 (2008); (R. 1 at ¶ 64 ("The residency restrictions . . . apply to people whose dates of conviction precede the effective date of the statute.")).[6] They argue that the residency statute therefore is an unconstitutional ex post facto law.

Plaintiffs are incorrect because, under Seventh Circuit precedent, the residency statute is not "retrospective." In *Leach*, the Seventh Circuit held that even though the Sex Offender Registration and Notification Act's ("SORNA") registration requirements applied to and "impose[d] significant burdens on sex offenders" convicted of a sex offense *before* SORNA's enactment, the registration requirements were not retrospective because "SORNA merely creates new, prospective legal obligations based on the person's prior history." 639 F.3d at 773. Thus, the court rejected the defendant's argument that the registration requirements retrospectively increased the punishment for his pre-SORNA conviction. *Id.* Here, it is impossible to meaningfully distinguish the residency statute, which similarly creates a "prospective legal obligation" regarding a person's residence "based on the person's prior history." *Id.* at 773; *see also, e.g.*, *Bhalerao v. Ill. Dep't of Fin. & Prof'l Regulations*, 11-CV-7558, 2012 WL 5560887, at *5 (N.D. Ill. Nov. 15, 2012) (citing *Leach* and explaining that a statute that revoked health care licenses of individuals convicted of certain offenses prior to the effective date of the statute was not retroactive); *Thompson v. State*, 603 S.E.2d 233, 235 (Ga. 2004) (explaining that a sex offender residency statute was not retrospective because it "d[id] not alter the consequences for the offense of child molestation; rather, it create[d] a new crime based in part on an offender's

---

[6] The residency statute was once codified in 720 Ill. Comp. Stat. 5/11-9.4(b-5) (2010), which was repealed in 2011, *see* Ill. Pub. Act 96-1551, art. 2, § 6 (2011), and moved to its current location in § 11-9.3, *id.* § 5.

status as a child molester"). *But see, e.g.*, *Commonwealth v. Baker*, 295 S.W.3d 437, 442 (Ky. 2009) (explaining that there "was no question" that a sex offender residency statute "applie[d] to conduct by Respondent that occurred well before the law's enactment").

## IV.    Substantive Due Process

Plaintiffs argue that the residency statute violates their right to substantive due process under the Fourteenth Amendment because the residency statute fails rational basis review.  (R. 1 at ¶ 87; R. 17, Mot. Extend Emergency Injunctive Relief, at 10.)  This argument does not succeed.

"Unless a government practice encroaches on a fundamental right, substantive due process requires only that the practice be rationally related to a legitimate government interest . . . ."  *Charleston v. Bd. of Trs. of Univ. of Ill. at Chi.*, 741 F.3d 769, 774 (7th Cir. 2013); *see also Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014) ("Where a non-fundamental liberty . . . is at stake, the government need only demonstrate that the intrusion upon that liberty is rationally related to a legitimate government interest."). Because the Plaintiffs invoke rational basis review, Plaintiffs have effectively conceded that no more exacting level of scrutiny applies.

"Those attacking a statute on rational basis grounds have the burden to negate 'every conceivable basis which might support it.'"  *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)); *see also Hayden*, 743 F.3d at 576 ("So long as there is any conceivable state of facts that supports the [policy at issue], it passes muster under the due process clause . . . ."); *Int'l Aerobatics Club Chapter 1 v. City of Morris*, 76 F. Supp. 3d 767, 786 (N.D. Ill. 2014).  It is not necessary that a rational justification also be the actual motivation for the law's enactment; "rather, the question

11

is whether some rational basis exists upon which the legislature could have based the challenged law." *Goodpaster*, 736 F.3d at 1071. Furthermore, the residency statute "is constitutional even if it is 'unwise, improvident, or out of harmony with a particular school of thought.'" *Id.* (quoting *Eby-Brown Co., LLC v. Wis. Dep't of Agric.*, 295 F.3d 749, 754 (7th Cir. 2002)).

The residency statute bears a rational relationship to a legitimate end: protecting children from convicted child sex offenders. A state "c[an] conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism." *Smith*, 538 U.S. at 103. The residency statute creates a buffer zone between a child sex offender's residence and certain locations in which children tend to congregate. It is at least "conceivable" that creating this buffer zone would further the goal of protecting children. *See Hayden*, 743 F.3d at 576. Thus, the residency statute survives scrutiny under the deferential rational basis standard. *See also, e.g.*, *Smith*, 538 U.S. at 102–03 (explaining the a sex offender registration law bore a rational relationship to the legitimate purpose of protecting the public); *Belleau v. Wall*, 811 F.3d 929, 943 (7th Cir. 2016) (Flaum, J., concurring) (explaining that a law requiring certain sex offenders to wear a GPS tracking device was rationally related to the purpose of protecting children); *Doe v. Miller*, 405 F.3d 700, 716 (8th Cir. 2005) (explaining that the Iowa legislature was "entitled to employ . . . 'common sense'" in implementing a similar residency statute); *Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 759–60 (E.D. Tex. 2015); *Doe v. Baker*, No. Civ.A. 1:05-CV-2265, 2006 WL 905368, at *5 (N.D. Ga. Apr. 5, 2006) ("Prohibiting a sex offender from living near a school or daycare is certainly an appropriate step in achieving the ultimate goal of protecting children."); *Leroy*, 828 N.E.2d at 781–82 (explaining that "it is reasonable to conclude that restricting child sex offenders from residing within 500 feet of a playground or a facility

providing programs or services exclusively directed toward persons under 18 years of age might also protect society").

The Court recognizes that some courts have questioned the rationality of similar laws. *See Does v. Snyder*, 834 F.3d 696 (6th Cir. 2016); *In re Taylor*, 343 P.3d 867 (Cal. 2015). In *Snyder*, the court examined in an ex post facto analysis whether a Michigan law that included a residency restriction similar to the one at issue here had "punitive" effects. 834 F.3d at 697–701. One consideration in the court's analysis was whether the law had a rational relation to a non-punitive purpose. *Id.* at 704. The court explained that the record provided "scant support" for the proposition that the law furthered the goal of "keep[ing] sex offenders away from" children. *Id.* It pointed to studies showing that sex offenders are *less* likely to reoffend than other types of criminals and that laws like the one in question "actually *increase* the risk of recidivism . . . by making it hard for registrants to get and keep a job, find housing, and reintegrate into their communities." *Id.* at 704–05.

*Snyder* is factually distinguishable because the statute at issue there included prohibitions on where a sex offender could work. *Id.* at 698. More importantly, the residency statute comports with the rational basis test—even if it may be "unwise, improvident, or out of harmony with a particular school of thought." *Goodpaster*, 736 F.3d at 1071 (quoting *Eby-Brown*, 295 F.3d at 754). As noted above, there need only be some conceivable set of facts that supports the statute's purpose. As Plaintiffs' complaint recognizes, it is conceivable that at least some child sex offenders present a recidivism risk, (R. 1 at ¶ 57 (noting that some sex offenders reoffend)), and that some child sex offenses are committed by individuals who are strangers to children or their "neighbor," (R. 1 at ¶ 61). Indeed, as the Supreme Court recognized in *Smith*, sex offender registry laws were enacted in response to the sexual assault and murder of a seven-year-old "by a

13

neighbor who, unknown to the victim's family, had prior convictions for sex offenses against children." 538 U.S. at 89. Moreover, as explained above, it is at least conceivable that creating some distance between a child sex offender's home and places where children congregate could increase the protection for at least some children. Consequently, Plaintiffs cannot plausibly allege that the residency statute fails the rational basis test.[7]

Plaintiffs as well as the California Supreme Court and the Sixth Circuit point out potentially persuasive reasons why the residency statute might be overly broad or not particularly effective. It has serious collateral effects on non-sex offenders (like Plaintiffs' family members). It makes it potentially difficult for a child sex offender to find a home, and it creates a risk that an offender who complies with the statute initially will be forced to later vacate his or her home due to the opening of a day care or other facility. This imposes potentially onerous costs on offenders and their families to break leases, sell homes, change schools, and periodically uproot their lives. The statute may contribute to increased homelessness, imposing a further strain on social services. It may undermine efforts of some offenders to reintegrate into the community as productive citizens. Finally, the residency statute may have all of these negative effects without providing much in terms of increased protection for children. These considerations, however, do not render the residency statute irrational under the rational basis test. As a result, the Court cannot rule it unconstitutional.

## V.     Unconstitutional Taking Without Just Compensation

The Takings Clause of the Fifth Amendment, which applies to the states through the Fourteenth Amendment, provides, "[N]or shall private property be taken for public use, without

---

[7] *Taylor* is similar to *Snyder*, as the California Supreme Court concluded that a residency statute (with a 2000-foot buffer requirement) had no rational relationship to protecting children because it "hamper[ed], rather than foster[ed], efforts to monitor, supervise, and rehabilitate" sex offenders on supervised parole in San Diego County. 343 P.3d at 879–82. The Court does not follow *Taylor* for reasons similar to why it declines to follow *Snyder*.

14

just compensation." *Bell v. City of Country Club Hills*, Nos. 16-1245, 16-1448, 2016 WL 6595965, at \*2 (7th Cir. Nov. 8, 2016) (published opinion) (quoting U.S. Const. amend. V). "This provision 'does not proscribe the taking of property; it proscribes taking without just compensation.'" *Sorrentino v. Godinez*, 777 F.3d 410, 413 (7th Cir. 2015) (quoting *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985)). "Nor does the [Takings Clause] require a state to pay compensation prior to or at the same time as a taking." *Id.* Accordingly, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied compensation." *Id.* (quoting *Williamson*, 473 U.S. at 195). There is a "limited exception" to this exhaustion requirement "based on the futility of seeking state court relief." *Peters v. Vill. of Clifton*, 498 F.3d 727, 732 (7th Cir. 2007) (quoting *Daniels v. Area Plan Comm'n of Allen Cty.*, 306 F.3d 445, 456 (7th Cir. 2002)).

The Seventh Circuit recently accepted a concession from a litigant that, while Illinois provided a procedure in which individuals could seek compensation for physical takings, it does not have such a procedure for regulatory takings. *Callahan v. City of Chicago*, 813 F.3d 658, 660 (7th Cir. 2016). The Seventh Circuit also cited authority in support of that concession. *See id.* The Court therefore proceeds to the merits, assuming that Plaintiffs' regulatory takings claim satisfies the *Williamson* exhaustion requirement. *See Stop the Beach Renourishment v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 729 (2010) (explaining that the requirement that a plaintiff seek just compensation is not jurisdictional); *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733–34 (1997) (describing the *Williamson* exhaustion requirement as "prudential").

A regulation can be so onerous that it violates the Takings Clause without requiring a physical invasion of land or destroying all economically beneficial use of property. *See Lingle v.*

*Chevron U.S.A. Inc.*, 544 U.S. 528, 538–39 (2005); *see also Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427 (2015) (explaining that compensation is required for a "regulatory taking" that goes "too far" (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922))).  To determine whether a regulation goes "too far," courts look to the factors articulated in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978): "(1) the nature of the government action, (2) the economic impact of the regulation, and (3) the degree of interference with the owner's reasonable investment-based expectations." *Goodpaster*, 736 F.3d at 1074; *see also Lingle*, 544 U.S. at 539.[8]

With respect to the first factor, "[a] 'taking' may more readily be found where the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124 (citation omitted).  The residency statute, as discussed above, promotes the legitimate and important public interest of protecting children from convicted child sex offenders.  It does not entail the government "physically invad[ing] or permanently appropriat[ing] any of the [Plaintiffs' property] for its own use." *See Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225 (1986).  While the residency statute interferes with offenders' ability to continue residing at a particular property, it does not otherwise interfere with their property interests.  Offenders may, for example, sell or otherwise transfer their property interest to another person.  Because the residency statute does not involve a physical invasion or appropriation of property, and because it amounts to an adjustment of economic burdens to promote the common good, the Court concludes that the first factor weighs in Defendants' favor.  *See Goodpaster*, 736 F.3d at 1074–75 (explaining that a smoking ban was

---

[8] Plaintiffs appear to agree that the test developed under *Penn Central* and its progeny is appropriate.  (*See* R. 17 at 12–13; R. 32 at 15.)

"a prototypical" example of a regulation that adjusted economic burdens to promote the common good, and that "[s]uch a character weighs heavily against finding a taking").

The second factor—the economic impact of the regulation—does little for Plaintiffs. "[T]he denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus v. Allard*, 444 U.S. 51, 65–66 (1979). Indeed, some regulations do not result in a "taking" even if they prevent a property owner from making "the most beneficial use of the property." *Penn Cent.*, 438 U.S. at 125. Here, as previously mentioned, the residency statute prevents Plaintiffs from residing in their current homes, which lowers the value of their property interests somewhat from their perspective, but the statute leaves much of the value of Plaintiffs' property interests untouched.

The final factor—the degree of interference with the owner's reasonable investment-based expectations—seals the fate of Plaintiffs' Takings Clause claim. When a party should reasonably expect a regulation to interfere with its investment, this factor will not favor the party's takings claim. *See Goodpaster*, 736 F.3d at 1074 (explaining that because smoking in public places had been regulated in a particular county since 2005, "[i]t should not have come as a surprise that the ordinance was later expanded to include appellants' business"); *see also Connolly*, 475 U.S. at 227 ("Prudent employers then had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations."); *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1091 (9th Cir. 2015) ("[T]hose who buy into a regulated field . . . cannot object when regulation is later imposed."); *Vesta Fire Ins. Corp. v. Florida*, 141 F.3d 1427, 1432 (11th Cir. 1998) (citing

17

*Connolly* for the proposition that "[i]nterference with investment-backed expectations occurs when an inadequate history of similar government regulation exists: where the earlier regulation does not provide companies with sufficient notice that they may be subject to the new or additional regulation"). Cardona became the owner of his home in 2010 and Vasquez began renting his in 2013. The residency statute has included a prohibition of living within 500 feet of "home day cares" since 2008. Consequently, when Plaintiffs acquired the property interests in question, they were on notice that future events—the opening of a school or day care, for example—could require them to move. The final *Penn Central* factor therefore weighs in Defendants' favor, and, when considered with the other factors, leads the Court to conclude that Plaintiffs' Takings Clause claim cannot succeed.

The purpose of the Takings Clause is to prevent the "Government from forcing some people alone to bear public burdens which, in fairness and justice, should be borne by the public as a whole . . . ." *See Goodpaster*, 736 F.3d at 1074 (quoting *Penn Cent.*, 438 U.S. at 123–24). The residency statute places restrictions on convicted child sex offenders to protect the community at large. It is not unjust to put the economic burden that accompanies these restrictions on the individuals whose prior conduct necessitated the regulations. Moreover, it is not illogical to place the economic burden on former offenders rather than the public because the former offenders have at least some ability to find housing that is likely to comply with the residency statute. For these reasons, Plaintiffs have failed to plausibly allege a violation of the Takings Clause.[9]

---

[9] Plaintiffs rely on *Mann v. Ga. Dep't of Corr.*, 653 S.E.2d 740 (Ga. 2007), where the Georgia Supreme Court concluded that a Georgia residency statute violated the Takings Clause. To the extent that *Mann*'s facts and analysis applies in this case, the Court respectfully parts ways with the reasoning of the Georgia Supreme Court for the reasons outlined above. The Court instead finds more persuasive an opinion from the Northern District of Georgia, which concluded that the Georgia residency statute did not violate the Takings Clause. *See Baker*, 2006 WL 905368, at *8–9.

**CONCLUSION**

For the foregoing reasons, the Court grants Defendants' motions to dismiss.

**Dated: December 9, 2016**

**ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge